Patricia E. GOULD, Plaintiff,

v.

KEMPER NATIONAL INSURANCE COMPANIES and Lumbermens Mutual Casualty Company, Defendants.

No. 93 C 7189.

United States District Court,
N.D. Illinois,
Eastern Division.

March 5, 1995.

530

Thomas J. Shannon, Jeffrey Grant Brown, Shannon & Brown, Ltd., Chicago, IL, for plaintiff.

Paul R. Garry, Brett G. Rawitz, Bates, Meckler, Bulger & Tilson, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Certain words resonanate badly in the ear of an employee. Fire, dismiss, remove. Terminate. Eliminate. Or, to use the euphemistic verb favored by employers in the 90s, Downsize. But no matter which word is used, the unavoidable byproduct is the same: people are put out of work.

The point at which a business' financial imperatives intrude on an individual's ability to earn a livelihood is often the point at which the individual invokes the protection of the law. It is axiomatic that businesses seeking to maximize their efficiency and their profits must keep up with the times, adapting to the current demands of an increasingly competitive and specialized marketplace. This adaptation may manifest itself through structural changes in the business. And these changes, by their very nature, may result in the elimination of specific job titles, positions, functions, sometimes whole departments. Those people who experience the effects of "downsizing" most directly and most viscerally are those employees who—like Patricia Gould, the plaintiff in this case—have lost their jobs through a Reduction–in–Force (RIF).

Patricia Gould was born in 1933. When she lost her job at Kemper National Insurance Companies and Lumbermens Mutual Casualty Company in 1993, she was just several months shy of her sixtieth birthday. Gould brings suit against Kemper because she believes her dismissal and her age were intrinsically related.

Gould had worked at Kemper since 1971, when she joined its Corporate Education Department. The Department trained Kemper employees to improve their performance and develop their careers. As a Program Developer/Instructional Designer and later as Manager of Instructional Design, Gould's duties involved designing study materials, classroom courses and training sessions.

In 1989, Kemper hired Barbara Brooks (born 1945) as Director of Corporate Education. Gould reported directly to Brooks, who in turn reported directly to Anthony Catania (born 1942), the Vice President of Human Resources. Aside from Gould, Brooks supervised nine employees. Seven of the nine exceeded forty years of age.

During the first two years of Brooks' tenure, Gould's responsibilities as Manager of Instructional Design remained the same. But then around April 1991, Brooks restructured the Corporate Education Department. Employees were shifted into different areas within the department, with the goal of matching individual skills with specific departmental needs. Brooks moved Gould laterally, to match Gould's administrative skills to a new, high priority project—The Career Development Resource Center (CDRC). Gould filled the newly created position of Assistant Director of Corporate Education, and was relieved of any previous supervisory responsibilities.

Gould spent a significant amount of time creating and administrating the CDRC. She was responsible for the planning and maintenance of the physical Resource Center facility, which was to be built in Long Grove, and the resources to be housed in the facility, in addition to related administrative tasks. Betsey Norris (age 37) joined Gould at the CDRC, as a training instructor.

In January 1992, the CDRC "Task Force" on which Gould sat added Kathie Murphy (age 46), to co-author with Gould the final CDRC proposal. Murphy, who had an M.A. and Ph.D. in Counseling, assumed responsibility for counseling Kemper employees. The final proposal, submitted by Gould and Murphy in September 1992, contained a clear division of duties in operating the CDRC. Gould would implement and administer all physical resource aspects of the facility; Murphy would supply individual employees with career counseling.

In the summer of 1992, Kemper's Expense Committee executives met to discuss ways to save costs in each department. The Committee told Human Resources Vice President Catania to supervise an RIF, and cut at least one "educator" within Corporate Education. Brooks did not learn of the RIF until a subsequent meeting with Catania.

Catania had the power and the discretion to find the most likely target for cuts. Since it was the only project that had not moved beyond the developmental state, the CDRC stood out as riper for cutting than more fully-realized projects. Under company policy, the elimination of an entire corporate function meant the elimination of all employees associated with that function. When the CDRC terminated, so too did the positions within it held by Patricia Gould and Betsey Norris.[1] The performance of neither woman apparently factored into Catania's decision.

After Gould and Norris left, Murphy continued to provide career counseling elsewhere at a reduced level, and she resumed her prior training work. Gould was never considered for Murphy's position since she lacked both Murphy's training and experience in counseling. Catania made attempts to find something for Gould in another department, but could find no space for her. After Gould's departure, the Corporate Education Department employed twelve persons, eight of whom were over 40 years old, two of whom were older than Gould.

Gould now claims that Kemper let her go because it thought she was too old to work there, and that it used the RIF merely as a pretext to cover up this discriminatory purpose. Kemper is liable to her, Gould claims, because its actions violate the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634.

Kemper refutes this, claiming its decision to eliminate the CDRC was legitimately motivated by the prudential business considerations of increased efficiency and maximized profits. Gould's age, Kemper maintains, simply did not factor into its decisions. Claiming Gould can produce no evidence to the contrary, Kemper moves for summary judgement.

## I. SUMMARY JUDGMENT IN ADEA CASES

 Summary judgment must be granted when there is no genuine issue of material fact within the record and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,*

---

**1.** Norris had already decided to leave Kemper before receiving the notice of termination under the RIF, but the parties agree that both Catania and Brooks were unaware of that fact when deciding to cut the CDRC.

477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When faced with a motion for summary judgment, all reasonable inferences must be drawn in the light most favorable to the nonmovant. *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 400 (7th Cir.1992). However, Gould cannot rely solely on her pleadings in the hope of avoiding summary judgment, but rather must affirm specific facts showing a genuine issue of material fact for trial. *Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Unless the jury could do this, "there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1363 (7th Cir. 1988).

■ The ADEA makes it unlawful for an employer "to discharge or otherwise discriminate against any individual because of such individual's age...." 29 U.S.C. § 623(a). An ADEA plaintiff's ultimate burden is to prove that her age was a determining factor in the termination decision—i.e., that she "would not have been fired but for the employer's motive to discriminate on the basis of age". *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 371 (7th Cir.1992), quoting *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984).

■ Age discrimination may be proven via (1) direct or circumstantial evidence that age was a determining factor, or (2) the indirect, burden-shifting method of proof originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later applied to ADEA claims. *McCoy*, 957 F.2d at 371. Therefore, summary judgment will be granted only if there is no genuine issue of material fact as to whether Kemper's motivation for discharging Gould was based on her age.

Although courts are less likely to grant this motion in discrimination cases due to the need to weigh defendant's motive and intent, *see United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), the Seventh Circuit has affirmed grants of summary judgment where the plaintiff's job was eliminated under an RIF. *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845 (7th Cir. 1992); *Aungst v. Westinghouse Elec. Corp.*, 937 F.2d 1216 (7th Cir.1991).

## II. THE DIRECT METHOD

To prevail under this prong of an ADEA claim, Gould must present direct or circumstantial evidence that Kemper used her age as a determining factor in its decision to terminate her employment. *McCoy*, 957 F.2d at 371; *Oxman*, 846 F.2d at 452. Gould offers three sentences, taken from the 1992 and 1993 Five Year Plans of Kemper's Human Resources Department, as proof that Kemper had a policy of age discrimination:

> The baby boom generation of employees have differing work values and expectations compared to the more mature generation of employees.

> Professional employees in the baby boom generation tend to be achievement-oriented and highly competitive.

> If we are to attract and retain these highly-qualified employees, managers will have to provide them with the quality leadership, development, and growth opportunities they are seeking.

[6] In *Hazen Paper Co. v. Biggins*, ––– U.S. –––, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993), a unanimous Supreme Court held that employers' decisions cannot be motivated by age, but may be motivated by factors empirically correlated to age. The specific age correlate the Court considered in *Hazen* was pension status. *Id.* at –––, 113 S.Ct. at 1705. But the Court confirmed that there are other age correlates—seniority, for example—which do not constitute discrimination under the ADEA, which forbids only those decisions motivated by an animus to the "protected trait" (i.e., a person's age). *Id.* at –––, 113 S.Ct. at 1706. Years of

service, seniority, and pension status may legally be considered by employers in making business decisions, because such decisions are not "necessarily age-based." *Id.* at ——, 113 S.Ct. at 1707. Employers motivated by "some feature other than the employee's age" could not be liable under the ADEA for treating their employees disparately. *Id.* at ——, 113 S.Ct. at 1705.

■ The Court was guided by Congress' professed purpose in passing the ADEA: the concern that older workers were being deprived of employment on the basis of "inaccurate and stigmatizing stereotypes," unsupported by objective empirical evidence showing the performance of older and younger employees to be roughly equal. *See id.* at ——, 113 S.Ct. at 1706 (quoting *E.E.O.C. v. Wyoming*, 460 U.S. 226, 231, 103 S.Ct. 1054, 1057, 75 L.Ed.2d 18 (1983). Age cannot be a proxy for competence, but competence alone may be considered. *See id.* The reason is simple: such considerations neither create nor perpetuate inaccurate and stigmatizing stereotypes, and therefore comport with the ADEA's admonition that "employers are to evaluate [older] employees on their merits and not their age." *Id.*

■ Gould argues that Brooks in particular, and Kemper in general, shared a view that extolled the virtues of things "new"— new ideas, new blood, new directions—and therefore denigrated (by implication) all things "old"—old ways, old thinking, the old guard. Gould might get by with the proposition that love of the new and antipathy toward the old are intrinsically linked, but only just; analysis at this level of generality could just as easily reveal them as mutually exclusive. But Gould cannot get by with her argument that love of the new is intrinsically related to an antipathy towards (and a concomitant desire to fire) older employees, especially when the evidence amassed by Gould in support of this contention consists of selective quotations from Kemper's written company policy. Just as the *Hazen* Court found age and pension status to be analytically distinct, so too is an appreciation of the new analytically distinct from a denigration of the old, and decisions motivated by the former are unlikely to be considered impermissibly

"age-based" under *Hazen. See id.* —— U.S. at ——, 113 S.Ct. at 1707.

The most Gould can show is that Kemper was cognizant of both a shift in generational demographics and the natural consequences of that shift for the company. But Gould's burden of production cannot be satisfied because there is no logical link between the quotes on which she relies and a dismissal she claims was predicated on her fifty-nine years.

■ Even taking as true Gould's allegations that Brooks made comments to the effect that there were "so many old people at Kemper," and interpreting such comments in the light most favorable to Gould (i.e., as showing a forbidden age bias), Gould still cannot surmount her burden, since these comments were unrelated to the decision to fire her, were made three to four years before her dismissal, and were made by someone other than the person who actually caused her termination. "Unless the remarks upon which a plaintiff relies *were related to the employment decision in question,* they cannot be evidence of a discriminatory discharge." *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir.1991) (holding racial jokes and writings made to plaintiff insufficient to support an inference of racially discriminatory firing when they were unrelated to the specific employment decision, were made two years prior to the firing and were not made by the decisionmakers) (emphasis added).

Brooks could only succeed if the remarks on which she relies were contemporaneous with and related to the firing, and made by Catania, the decisionmaker. *Brom v. Bozell, Jacobs, Kenyon & Eckhardt,* 1993 WL 313049, 1993 U.S. Dist. LEXIS 11259 (N.D.Ill.1993); *McCarthy,* 924 F.2d at 687; *La Montagne,* 750 F.2d at 1412. *See also Guthrie v. Tifco Industries,* 941 F.2d 374, 378–79 (5th Cir.1991). As they were not, Gould cannot raise a genuine issue of material fact under the "direct" method. Gould must rely therefore on the indirect, burden-shifting method as "an alternate route to relief." *McCoy,* 957 F.2d at 371.

## III. THE INDIRECT METHOD

### A.

■ To succeed under this method, Gould must first establish a prima facie case of age discrimination. She may do so by showing that (1) she was within the protected group (age 40 to 70); (2) she was performing her job well enough to meet her employer's legitimate expectations; (3) she was discharged; and (4) others outside the protected class were treated more favorably.[2] *Konowitz v. Schnadig Corp.*, 965 F.2d 230, 232 (7th Cir.1992); *Young v. Will County Dept. of Public Aid*, 882 F.2d 290, 293 (7th Cir.1989); *Oxman*, 846 F.2d at 455.

■ Gould satisfies the first three elements of the test, but has insurmountable difficulty with the elusive fourth element.[3] Kemper argues that Gould cannot establish that younger employees were treated more favorably because Betsey Norris, age 37, was

---

**2.** Gould cites and applies a markedly different prima facie test, that employed by the Seventh Circuit in *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321 (7th Cir.1987). According to Gould, she may prove her prima facie case by showing (1) she was within the protected age group; (2) she was adversely affected by discharge or demotion; (3) she was qualified to assume another position at the time of the discharge or demotion; and (4) that a factfinder might reasonably conclude from the circumstantial or direct evidence she presents that the employer intended to discriminate in making the employment decision at issue.

Gould's own understandable preferences for things old has apparently, if understandably, blinded her to some things new, at least new developments in the law. In citing to *Coston*, Gould mentions neither the Supreme Court's vacation of the *Coston* judgment, *see* 486 U.S. 1020, 108 S.Ct. 1990, 100 L.Ed.2d 223 (1988), nor the explicit overruling in *Oxman* of the test employed by the *Coston* Court. *Oxman*, 846 F.2d at 455–56 (rejecting the Fifth Circuit prima facie proof formulation for RIF cases recently adopted in *Matthews v. Allis–Chalmers*, 769 F.2d 1215 (7th Cir.1985)).

Under Rule 11, an attorney's signature on a pleading or written motion certifies "that to the best of that person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the "claims, defenses, and other legal contentions therein are warranted by existing law." Fed.R.Civ.P. 11(a) and (b)(1)–(2). District courts have the discretion to impose appropriate sanctions upon the attorneys, firms, or parties deemed to have violated these provisions, and may do so sua sponte. Rule 11(c).

Gould's attorneys—Jeffrey Brown, Thomas Shannon and Jill Rein—have framed their client's claim under law which is not only outdated, but whose obsolescence was reasonably discoverable through standard research techniques. (The citation of a completely different test by Kemper alone should have been sufficient to put Gould's attorneys on notice that the law, if not outdated, was conflicted.) Such sloppiness and inattention to the material determinants of the litigation carries the potential to mislead the court and waste its precious resources on claims of dubious legality.

Similarly slipshod, if less egregious, is Kemper's own failure to notice any discrepancies and bring them to the court's attention. While tempted to direct Gould's attorney's to show cause why they should not be sanctioned, I will instead leave it to Kemper to decide if it wishes to make a motion for sanctions under Rule 11(c)(1)(B). Meanwhile, I analyze Gould's claims under the correct test.

**3.** Elusive because the fourth element required by the *Oxman–Young–Konowitz* line is not sine qua non to a prima facie showing of age discrimination. *See Kralman v. Illinois Dept. of Veterans' Affairs*, 23 F.3d 150, 153–55 (7th Cir.1994) (noting that the *Oxman* line of decisions state that a plaintiff "may," not "must," establish a prima facie case by showing that "(4) the employer treated others outside the protected class more favorably."). *But see Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994) (stating that plaintiff "*must* show ... that younger employees were treated more favorably") (emphasis added).

The Seventh Circuit has adopted an array of "fourth elements," each tailored for differing types of employment actions—hiring, nonpromotion, demotion, discharge. In discharge cases like Gould's, there are at least four variations. *See e.g., Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir.1994) (requiring proof that others outside the protected class were treated more favorably); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir.1993) (requiring proof that the employer sought a replacement for discharged employee); *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir.1993) (requiring proof that the discharge occurred under circumstances which gave rise to an inference of age discrimination); *Grohs v. Gold Bond Bldg. Products.*, 859 F.2d 1283, 1286 (7th Cir.1988) (requiring proof that plaintiff was replaced by a younger employee).

Of the variations on a prima facie case based on discharge, the *Oxman* test is most suited to RIF situations, where such employment actions do not involve the replacement of a discharged employee. *Oxman*, 846 F.2d at 454. *Oxman* itself was a variation of *McDonnell Douglas*, specifically tailored for an RIF scenario. *Konowitz*, 965 F.2d at 232.

also discharged. However, this does not exhaust the list of CDRC employees younger than Gould who were retained by Corporate Education after the RIF.[4]

 Kathie Murphy, age 46, stands out as having possibly been given preferential treatment, since she survived the termination of the CDRC. Putting aside Murphy's dissimilar job duties, Murphy's objectively greater skills and qualifications in the sphere of counseling, and Murphy's lack of physical attachment to the CDRC, and making all reasonable inferences in the light most favorable to Gould, it is (at the least) not unreasonable to assume that age played a factor in Kemper's disparate treatment of the two women. Gould can therefore establish her prima facie case. *See, e.g., Daugherity v. Traylor Bros., Inc.,* 970 F.2d 348, 354 (7th Cir.1992). In so doing, she creates a rebuttable presumption that Kemper unlawfully discriminated against her. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

### B.

 Once a prima facie case has been demonstrated, the burden shifts to the employer to articulate some legitimate nondiscriminatory reason for its action which *"if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the [discharge]." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The shift is in the burden of production only, not persuasion.[5] *Id.*

 Kemper claims that Gould was let go as part of a cost-cutting RIF. According to Kemper, the elimination of Gould was part and parcel of the elimination of the CDRC—the only project in Corporate Education in a developmental stage, and therefore the first in line at the budgetary guillotine. To support this contention, Kemper produces its guidelines for implementing an RIF, whereby eliminating a corporate function requires firing the employees associated with that function. The production of these guidelines satisfies Kemper's burden. The presumption of discrimination dissolves and the burden shifts back to Gould to prove that Kemper's reasons are simply a pretext for discrimination. *Id.; Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir.1994).

### C.

To prove pretext, Gould must produce evidence that Kemper was more likely motivated by discriminatory reasons or that the reasons offered are not worthy of credence. *Robinson,* 23 F.3d at 1163; *McCoy,* 957 F.2d at 372. "A pretext, in employment law, is a reason that the employer offers for the action claimed to be discriminatory and that the court disbelieves, allowing an inference that the employer is trying to conceal a discriminatory reason for his action." *Visser v. Packer Engineering Assocs., Inc.,* 924 F.2d 655, 657 (7th Cir.1991). Gould advances four arguments which purport to raise an inference of pretext.

### i.

First, Gould argues that the CDRC was not her principal job responsibility, and that the RIF was a pretext fabricated by Kemper to cover its improper termination of her job. Gould claims that Kemper has overexaggerated her involvement with the CDRC, and that her fate was not so intertwined with that of the CDRC so that its elimination would necessitate her own.

 Gould offers in support of this argument her own affidavit, in which she states that she spent only 20% of her time on the CDRC. This affidavit testimony is problematic since it directly contradicts Gould's deposition testimony, in which she asserts that "most" of her time was spent on the

---

**4.** ADEA actions can be based on discrimination between older and younger members of the protected class. *Kralman,* 23 F.3d at 155, citing *Miller v. Lyng,* 660 F.Supp. 1375, 1377 n. 2 (D.D.C.1987); 3A Larson, Employment Discrimination § 98.53, at 21–59 (1990).

**5.** The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747, quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

CDRC. An ADEA plaintiff cannot avert summary judgment by creating issues of fact through an affidavit which contradicts deposition testimony. *Darnell,* 16 F.3d at 176–77, citing *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985); *McCarthy,* 924 F.2d at 687; *see Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1104 (7th Cir.1985). When statements in a deposition and an affidavit directly conflict, the contradictory affidavit is disregarded for purposes of summary judgment. *Darnell,* 16 F.3d at 176–77 (finding an inherent "increased level of reliability in depositions, because they are adversarial in nature and provide the opportunity for direct and cross examination"). Striking Gould's affidavit testimony eviscerates the argument which relied on it.[6]

**2.**

■ Secondly, Gould argues that Brooks concocted a plan to dismiss her several years before the RIF, and that the CDRC was set up so that its eventual termination could provide cover for firing Gould. Courts look skeptically at "elaborate plot theories." *Konowitz,* 965 F.2d at 234. *See also McCoy,* 957 F.2d at 372 (affirming dismissal on summary judgment where ADEA plaintiff alleged that a transfer to a newly created position was "merely a transition point from which WGN could fire him"); *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1571 (7th Cir.1989) (finding "*exceedingly* improbable" an ADEA plaintiff's allegations that he was transferred to a new division in the hope that he would fail and this failure would provide an excuse for his employer to fire him). One problem with Gould's theory that she was "set up" for a fall is that it presupposes either a long-range conspiracy between Brooks and her superiors, or Brooks' prescient knowledge in 1991 of an RIF not decided on until 1993.

Another problem with this theory is that it is unsupported by the evidence. Not only is Gould unable to point to anything in the record which suggests either conspiracy or premonition, but what evidence there is indi-

cates that Kemper's Human Resources Department highly valued the CDRC project, and Gould's involvement in its development and maintenance was (and would have continued to be) real and substantial. Rather than supporting an inference of pretext, the record shows Kemper's elimination of the CDRC to be a reasonable business decision, and therefore unreviewable by this court. *Konowitz,* 965 F.2d at 233; *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions."). Since this argument of Gould's is both implausible and without foundation, it must fail.

**3.**

Third, Gould argues that Catania's exercise of discretion in cancelling the CDRC was inconsistent with the recommendations he received about the proposed targets of cuts. Gould points to the disparity between the Budget Committee's recommendation to "[e]liminate 1 educator" and Catania's subsequent elimination of Gould, an "Assistant Director of Corporate Education," claiming this inconsistency raises a reasonable inference of age animus.

■ It is undisputed that the Committee afforded Catania discretion in complying with its recommendation. Catania thought it more prudent to cut the CDRC—a project still in its developmental stage—than reducing his education staff. Whether Catania's decision was a good or bad one is beside the point; unless it was based on Gould's age, it cannot be second-guessed. *See Pollard v. Rea Magnet Wire Co., Inc.,* 824 F.2d 557, 560 (7th Cir.1987) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere.").

■ There is nothing to indicate that Catania considered the ages of any CDRC staff when he made his decision, and the firing of the thirty-seven year old Norris along with the fifty-nine year old Gould does nothing to

---

**6.** I take note of Kemper's request for Rule 11 sanctions against Gould for citing contradictory testimony, but decline this invitation. Kemper may, if it wishes, raise this issue should it move for sanctions, as discussed in footnote 2 of this opinion.

imply otherwise. Catania cannot be faulted for terminating the CDRC if he had an honest belief that decision was the better corporate move. *McCoy*, 957 F.2d at 373. Since the record cannot support an inference that Catania's decision amounted to a pretext, Gould's third argument is fruitless.

**4.**

Fourth and finally, Gould argues that a pretext may be shown by Kemper's failure in not terminating, along with the CDRC, every employee associated with it. Gould asserts that if Kemper had actually implemented the RIF, Kathie Murphy would also have been terminated along with Gould and Norris. Moreover, Gould asserts she could have been easily trained to fill Murphy's job.

Gould ignores the different degree of physical attachment she and Murphy had to the CDRC. Gould's responsibilities were grounded in the physical structure and administration of the center. Murphy's counseling duties, on the other hand, could (and would) be performed anywhere. Gould also ignores Murphy's strong counseling qualifications, including a doctorate degree, which suggest a motive not related to age behind Kemper's retention of Murphy. Gould's argument that she could have filled Murphy's job had she been properly trained may have been true, but is severely undermined by Gould's rejection of an opportunity (offered by Brooks prior to the RIF) to take a seminar to begin acquiring counseling skills.

The question is not whether Kemper "exercised prudent business judgment ... but whether [Gould] has come forward to refute the articulated, legitimate reasons for her discharge." *Id.*, citing *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir.1983). She has not. Gould's offer of proof "casts [no] doubt upon the veracity of the employer's stated reason for its action." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 98 (7th Cir.1985). Accordingly, no reasonable trier of fact could conclude on the record that Kemper used the RIF as a pretext for discriminating against Gould on the basis of age.

**IV. CONCLUSION**

Whether they are fired, terminated, dismissed, or whether their department was downsized, rightsized, or resized, many employees—especially older ones—might be forgiven for cynically thinking that R.I.F. was the equivalent of R.I.P. Since being fired without cause is often perceived as inherently unjust, and justice is supposedly the business of the courts, it is perhaps unsurprising that those who have lost their jobs often look to the courts for relief.

What protections the ADEA affords plaintiffs like Patricia Gould depends on their ability to prove that, but-for their age, they would still have their job. The ADEA does not "protect an older employee from being fired without good cause. It protects h[er] from being fired because of h[er] age." *Visser*, 924 F.2d at 657. But since the evidence shows that Gould's age played no role in Kemper's decision to assign Gould to the CDRC, to target the CDRC and its staff for cuts, or to retain Murphy's services for counseling, Kemper's motion for summary judgment must be granted.