**Seiko M. GREEN, Plaintiff,**

v.

**THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, Defendant.**

**Civil Action No. 97–0146–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Feb. 2, 1998.

---

Patrick A. Malone, Stein, Mitchell & Mezines, Washington, DC, Lucinda Sikes, Michael Tankersley, Public Citizen Litigation Group, Washington, DC, for Plaintiff.

Helen F. Fahey, United States Attorney, Arthur E. Peabody, Jr., Assistant United States Attorney, Alexandria, VA, Jeffrey Landou, Assistant General Counsel, National Archives and Records Administration, College Park, MD, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff brings this suit to obtain judicial review of the National Archives and Records Administration's ("NARA") decision to dispose of over 2000 motion picture films that are a part of a NARA collection known as

Record Group 260 ("RG–260"). At issue specifically, given the parties' cross motions for summary judgment, are;

> (i) whether NARA's refusal to allow plaintiff continued access to the films after December 1996, given its disposal decision, constitutes an "improper withholding" under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552;
>
> (ii) whether plaintiff has standing to challenge NARA's disposition of the films under the Disposal of Records Act ("DRA"), 44 U.S.C. § 3301 et seq.;
>
> (iii) whether NARA provided proper notice of its intention to dispose of the films under the DRA; and
>
> (iv) whether NARA's decision to dispose of the films was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

## I.

As every school child learns and a diminishing number of us remember, the United States occupied the various Japanese islands, including the Ryukyus,[1] following the end of World War II. As part of the post-war occupation effort, the U.S. Occupation Headquarters established the United States Civil Administration of the Ryukyu Islands ("USCAR"), which administered the Ryukyus for a period of approximately twenty five years. When the Ryukyus reverted to Japan in 1972, USCAR was dissolved, and its records were transferred to NARA. Among these records are the approximately 2185 films now collected, categorized, and known as RG–260. These films, many of which are labeled in Japanese and have Japanese soundtracks, were taken throughout the occupation period and chronicle the events and circumstances of that period. NARA's guide to its holdings specifically describes the RG–260 films as

depicting "historical events, personalities, ceremonial events, and social and economic activities in the Ryukyu Islands, . . . ." In the aggregate, the films, contained in 56 boxes, have a viewing time of approximately 360 hours.

The NARA custodial unit charged with storing the films is the Motion Picture, Sound, and Video Branch ("The Branch"). In 1995, the Branch began to re-appraise the films, a process whereby NARA records are reviewed to determine whether they are worthy of continued retention. Records that do not have sufficient "administrative, legal, research, or other value to warrant their continued preservation by the Government" may, after notice and an opportunity for interested parties to comment, be disposed of pursuant to the DRA. 44 U.S.C. § 3303a(a). Based on this standard, NARA has promulgated, through its Records Management Handbook and other publications, additional criteria and procedures for appraising records of permanent value.[2] This appraisal process enables NARA to avoid both a loss of valuable documentation and the retention of duplicative or unnecessary documentation.

The RG–260 review or re-appraisal task was assigned to Steven Hamilton, a NARA employee with some Japanese language skills. At the time he began viewing a sample of the films in June 1995, Hamilton was employed in the Records Declassification Division of NARA, but had not previously worked with NARA's audiovisual holdings. The assignment was Hamilton's first appraisal of audiovisual records, and it was conducted as part of a cross-training exercise designed to expose Hamilton to a new branch within NARA.

After sampling films from at least 30 of the 56 boxes, Hamilton issued a report dated September 25, 1995, recommending that the

---

1. The Ryukyu islands, which include the island of Okinawa, are a series of small islands located southwest of the larger Japanese island of Kyushu.

2. See RECORDS MANAGEMENT HANDBOOK, DISPOSITION OF FEDERAL RECORDS (1992). In the Records Management by the Archivist Act, 44 U.S.C. § 2901 et seq., Congress required NARA to establish these

"standards for the selective retention of records of continuing value." 44 U.S.C. § 2905(a). Of particular interest here, the Handbook instructs that duplicate records will not generally merit permanent retention by NARA, and that similar records and holdings should be consulted in determining the retention of a record. See HANDBOOK at IV–2. Further, the Handbook provides that "NARA generally designates as permanent only the most complete series of records." Id.

films be considered for disposal. In his report, Hamilton concluded that much of the subject matter of the films was of particular local interest, and that to the extent the films chronicled the U.S. administration of the Ryukyus, that role was better documented by other films contained within NARA's permanent holdings. Specifically, Hamilton reasoned that;

> [T]he best appraisal of the project film is a comparison with the film that is already within the permanent holdings of [Motion Picture, Sound and Video Branch]. There seems [sic] to be many films within the holdings *that cover the Army presence from 1944 to 1961.* Subjects covered are very similar to those in the project...My recommendation for the film of this project hinges on the comparison with the permanent holdings that [the Branch] has and those of the project. It seems that the time period is all ready [sic] well documented in the permanent holdings and no significant new insights are provided by the project film. (emphasis added).

Thus, apparently central to Hamilton's conclusion was the erroneous assumption that the films covered only the seventeen year period from 1944 to 1961 [3] and not the approximately twenty-five year period of US-CAR's administration of the Ryukyus. Yet, this is not the complete story. In support of his conclusion, Hamilton attached an appendix to the report that provided a brief description of the content of the films he had sampled from the thirty boxes, and at times, the date on which a particular film had been made. Contrary to the body of the report, the appendix indicates that Hamilton reviewed films dated later than 1961. For example, the appendix noted that at least one film was dated 1969, and several others were dated 1970.

Hamilton's report, including the appendix, was sent to Donald Roe, the NARA audiovisual expert assigned to supervise Hamilton's cross-training exercise, and ultimately, to make a formal recommendation concerning the disposition of the films. Roe concurred with Hamilton's overall evaluation of the films, and his December 7, 1995 letter to this effect perpetuates Hamilton's error concerning the span of years covered by the RG–260 films. Specifically, Roe noted that the Branch "[has] a large number of films in [its] holdings relating to the Ryukyu Islands *during the period 1944–1961* ...The films in this accession [RG–260] cover many of the same subject areas as the films [the Branch] already ha[s]." (emphasis added). Accordingly, Roe, in the same letter, recommended disposing of all RG–260 films save one. Yet, as in the case of Hamilton's report, this is not the whole story as to Roe. In his December 7 letter, Roe referred to Hamilton's appendix in recommending that the Branch retain a film from box # 26, which consisted of an interview with British journalist Norman Barrywine.[4] Roe's recommendation then went on up the line where David Kepley, the Chief of NARA's Motion Picture, Sound, and Video Branch accepted it, and in February 1996, requested authorization from the Archivist to destroy the RG–260 films.[5] A standard Form 115 schedule for records disposition was attached to Kepley's request.[6]

---

3. The record does not disclose why the stated time period begins in 1944, one year before the end of World War II and the commencement of the occupation period.

4. Hamilton's appendix notes that the filmed interview covered events taking place in North Vietnam, but neither the appendix nor this record disclose the date of the film.

5. Kepley's request to the Archivist perpetuated the error concerning the period covered by the films by stating that "[t]he [Branch] has completed a reappraisal...job...of black and white and color film produced or acquired by the U.S. Civil Administration Ryukyu Islands (USCAR), *1941– 1961.* The [Branch] has determined that NARA already has in its motion picture holdings similar footage...that sufficiently document USCAR activities...The [Branch], therefore, requests authorization to dispose of these films." (emphasis added).

6. The film collection is described on the Form as "Motion Pictures produced or acquired by US-CAR, *1944–1961.* Fifty-six boxes of black and white, and color, silent and sound, negative and positive, primarily 16MM, films that document subject matter already sufficiently documented among NARA's motion picture holdings." (emphasis added). The Form goes on to provide that the films are to be "[d]estroy[ed] upon approval of this schedule."

Plaintiff is a historical researcher with a particular interest in relations between the United States and Japan following World War II. She first learned about the RG–260 film collection in March, 1996, while conducting research at NARA. Shortly thereafter, she made an informal request for access to the films, and was apprised at that time of Hamilton's report concerning the films, and the recommendation for disposal. Undeterred, plaintiff made a FOIA request to view the films on April 11, 1996. NARA granted plaintiff's request, and viewing arrangements were made to allow plaintiff access to the films whenever the NARA audiovisual facility was open. Plaintiff began viewing the films in June 1996, and over the ensuing six months, spent well over one hundred hours at NARA's audiovisual facility viewing the films.

Meanwhile, NARA proceeded with its plan to dispose of the films. After receiving concurrence on the matter from the Office of the Secretary of the Army, the original custodian of the films, NARA published notice of its intention to dispose of the films in the Federal Register on May 2, 1996. *See* 61 Fed.Reg. 19643. The notice stated that its purpose was to "(1) propose the destruction of records not previously authorized for disposal, or (2) reduce the retention period for records already authorized for disposal." The notice further described the films at issue as "[d]uplicated motion picture film relating to the administration of the Ryukyu Islands, accumulated by the U.S. Civil Administration Ryukyu Islands." The notice referenced the Form 115 schedule submitted by NARA, and provided that the schedule "contains additional information about the records and their disposition." Additionally, the notice advised viewers that additional "information about the disposition process would be furnished to each requester." In the circumstances, no public comments were received in response to the notice. Accordingly, the Archivist, on July 9, 1996, certified the films as

non-permanent, and subject to destruction. Plaintiff was informed of this decision, but was assured that the films would remain available to her through the end of 1996. NARA fulfilled this commitment and plaintiff was given access to the film collection through December 1996.

Contemporaneously with her review of the films in the Fall of 1996, plaintiff requested reconsideration of the disposal decision. In response, NARA adhered to its position that the films lacked permanent value to the United States, and confirmed its intention to donate the collection to another agency, or, failing that, to dispose of the films. Plaintiff was also advised that she would be allowed to have the films copied at her expense, an option she contends is not economically feasible for her. Plaintiff's final request for an extension of time to complete her research was denied by NARA on January 21, 1997. On January 27, 1997, the Archivist deeded the films to the Okinawa Prefectural Archives ("OPA"), and the films were scheduled to be shipped to the OPA on February 11, 1997.[7]

Plaintiff then filed this action alleging violations of the Freedom of Information Act, 5 U.S.C. § 552, the Disposal of Records Act, 44 U.S.C. §§ 3301–14, and the Administrative Procedure Act, 5 U.S.C. § 706. Specifically, plaintiff's three count complaint alleges that;

(count 1) NARA provided insufficient notice of its intention to dispose of the films in violation of DRA;

(count 2) the Archivist's decision to dispose of the Records was arbitrary, capricious, and an abuse of discretion under the APA; and

(count 3) NARA's denial of her request for continued access to the films at the end of 1996 violated the FOIA.

By Order dated February 11, 1997, NARA was prohibited from transferring or disposing of the films pending the resolution of this matter.[8] On February 11, 1997, plaintiff was

**7.** OPA first expressed interest in the films in July 1996 after learning that the films were slated for disposal. NARA determined that OPA would be an excellent repository for the film collection given OPA's modern facilities and understanda-

ble interest in the subject matter of the collection.

**8.** *See* Order, *Green v. The National Archives And Records Administration,* No. 97–0146–A (E.D.Va. February 11, 1997).

again given access to the films, and her access continues pending the resolution of this matter.[9]

In response to the complaint, defendant filed a motion to dismiss, or, in the alternative, for summary judgment, which was argued on August 29, 1997. By Order dated September 2, 1997, summary judgment was granted as to the first and third causes of action, and deferred as to the second.[10] On November 7, 1997, while the matter remained pending, plaintiff filed a motion for summary judgment as to the second count in the complaint, and a conditional motion for reconsideration of the third cause of action.[11] Each party has filed affidavits to supplement the administrative record, and each party has moved to strike the other's supplemental affidavits. This Memorandum Opinion disposes of the pending summary judgment motions and motions to strike. It also sets forth the reasons for the earlier disposition of counts one and three.

## II.

Summary judgment is appropriate in cases where there is no genuine dispute as to any material fact and where it appears that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. Thus, summary judgment should be granted "where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 974 (4th Cir.1990). On summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Yet, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

In her effort to block NARA's disposition of the RG–260 films, plaintiff has imaginatively, if unpersuasively, invoked FOIA. Specifically, plaintiff contends that NARA's decision to dispose of the RG–260 collection and its consequent refusal to continue to allow plaintiff access to the films constitute "improper withholding" of documents under FOIA. This contention is legally and factually baseless.

In enacting FOIA, Congress sought to "open agency action to the light of public scrutiny" by requiring agencies to adhere to "a general philosophy of full agency disclosure." *Department of Air Force v. Rose,* 425 U.S. 352, 360, 372, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). To that end, FOIA commands each agency to "promptly [make] available," upon request, all agency records that do not fall within certain statutory exceptions. 5 U.S.C. § 552(a)(3). Further, FOIA confers jurisdiction on the district courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). To establish this jurisdiction, there must be "a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'" *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 150, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). Absent such a showing, "a district court lacks jurisdiction to devise remedies to force an agency to comply with FOIA's disclosure requirements." *United States Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 142, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989). Thus, once an agency has produced the records sought, "the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made." *Crooker v. United States State Dep't,* 628 F.2d 9, 10 (D.C.Cir.1980).

---

**9.** It appears, therefore, that plaintiff has now had access to the RG–260 films for approximately eighteen months.

**10.** *See* Order, *Green v. The National Archives And Records Administration,* No. 97–0146–A (E.D.Va. September 2, 1997).

**11.** *See infra* note 22.

By granting plaintiff's FOIA request and promptly providing her with reasonable access to the entire RG–260 film collection, NARA satisfied its disclosure obligations under FOIA. Further, the duration of this access was, under the circumstances, entirely reasonable as plaintiff received uninterrupted access to the collection from June through December 1996. Indeed, while NARA received authority from the Archivist to dispose of the films in July 1996, it made the films available to plaintiff for an additional five months to accommodate her ongoing research. NARA's eventual removal of the films to carry out its plans for their disposal necessarily halted plaintiff's access to the collection. Yet, there can be no doubt that an agency's refusal to grant continuing access to records that are to be disposed of imminently pursuant to the DRA does not constitute an "improper withholding" under FOIA. Were this not so, FOIA would become the effective weapon of choice to be used by anyone seeking to block or frustrate a records disposal decision lawfully made under the DRA.

To be sure, NARA's discretionary decision to dispose of records under the DRA in the instant case has had an adverse impact on a FOIA requester's access to those records. Yet, it does not follow that a conflict exists between the two statutes. FOIA, a disclosure statute, does not obligate agencies to retain all records, nor does it establish specified procedures designed to guide disposal determinations. Rather, such requirements are imposed by the DRA, and FOIA only obligates agencies to provide access to those documents in its possession. *See Kissinger,* 445 U.S. at 150–54 (concluding that agency possession or control of records is a prerequisite to triggering duties under the FOIA). Thus no FOIA violation occurs where, as here, an agency denies access or continued access to records scheduled for imminent disposal in accordance with the DRA.[12] To hold otherwise impermissibly reads into the DRA an exception for records requested under FOIA, thereby potentially vitiating the DRA's utility by allowing the agendas of FOIA requesters to trump agency expertise in making discretionary disposal determinations.

In sum, NARA has not improperly withheld records within the meaning of FOIA simply because it has discontinued access to documents scheduled for imminent disposal under the DRA. Accordingly, this Court lacks jurisdiction over plaintiff's FOIA claim.

## IV.

Plaintiff's challenge to the merits of NARA's disposal decision is met, at the threshold, with an attack on plaintiff's standing to sue under the DRA. Because the DRA supplies the statutory responsibilities governing the disposal of federal records, an appropriate plaintiff, one with standing, may invoke the DRA's protections in challenging an agency's proposed disposition of agency records. Thus, there is no doubt that complaints alleging DRA violations are subject to judicial review under the APA. 5 U.S.C. §§ 701(a), 706; *See American Friends Service Committee v. Webster,* 720 F.2d 29, 39–45 (D.C.Cir.1983)(agency DRA determinations are subject to judicial review under the APA). In the instant case, plaintiff challenges NARA's procedural compliance with DRA, and also contends that the substantive result reached by NARA was arbitrary and capricious. 5 U.S.C. § 706(2)(A) & (D). Yet, as a prerequisite to judicial review of these contentions, plaintiff must establish the threshold Article III constitutional standing.

Under the APA, which "gives any person 'adversely affected or aggrieved by agency action within the meaning of a relevant statute' the right to seek federal court review," the party seeking judicial relief must show: (1) that she has suffered an

---

12. To be sure, circumstances might arise where the length of time between the making of a FOIA request for agency records and the proposed disposition date for the requested records is so substantial that a refusal of access pending disposition would fall under FOIA. To conclude otherwise would effectively allow an agency to misuse the DRA to disguise an improper withholding under FOIA. Put another way, an agency cannot evade FOIA's disclosure requirements where it will, pursuant to its disposal plan, retain the records for a substantial period before effecting the authorized disposition. This is not such a case.

actual injury within the zone of interests protected by the statute; (2) that the injury is fairly traceable to the challenged agency action; and (3) that the alleged injury is such that it likely would be redressed by a favorable judicial decision. *GBA Associates v. General Services Admin.,* 32 F.3d 898, 900 (4th Cir.1994)(quoting 5 U.S.C. § 702). This record points persuasively to the conclusion that plaintiff easily satisfies these standing requirements.

As to the first prong of the inquiry, a clear consequence of NARA's disposal decision is that plaintiff, a private researcher who has made extensive use of the film collection, will be deprived of continued access to the films. Her study of the films at NARA will, of necessity, cease. As such, the loss of the films will cause plaintiff to suffer a "distinct and palpable injury, more than hypothetical or conjectural," sufficient to satisfy the injury in fact requirement for standing. *GBA Associates,* 32 F.3d at 900. And NARA's characterization of plaintiff's interest in the films as merely "speculative...and general," is inaccurate on this record and its labeling of her interests as "ideological" is simply irrelevant to the standing requirement. It is inescapable that this plaintiff, as a researcher and scholar, suffers an actual injury if an agency disposes of documents relevant to her research and scholarly endeavors. Nor is there any doubt that researchers and historians who make extensive use of government documents fall squarely within the zone of interests protected by DRA. *See Webster,* 720 F.2d at 57 (finding that "Congress intended, expected, and positively desired private researchers and private parties whose rights may have been affected by government actions to have access to the documentary history of the federal government"); *See also, Armstrong v. Bush,* 924 F.2d 282, 289 (D.C.Cir.1991)(researchers are within the zone of interests of the records creation and management provisions of the Federal Records Act).

The remaining requirements for standing are also plainly met. The second prong of the analysis, the causation requirement, is satisfied as plaintiff's injury is directly traceable to the challenged disposition of the films. *GBA Associates,* 32 F.3d at 900. And, under the third prong, plaintiff's injury is obviously judicially redressable because a favorable ruling here on the lawfulness of the disposal determination would prevent, at least temporarily, the transfer of the RG–260 films. Accordingly, plaintiff has standing to maintain her challenge to NARA's disposition of the RG–260 film collection.

## V.

Plaintiff's procedural challenge to NARA's decision to dispose of the RG–260 collection focuses on the adequacy of the agency's notice. Specifically, plaintiff asserts that NARA failed to provide proper notice of its intention to dispose of the films as mandated by the DRA. *See* 44 U.S.C. § 3303a(a). Plaintiff characterizes NARA's published notice as "inaccurate and misleading," contending that the notice implies merely that duplicate copies of the films are to be discarded, while other copies .will remain accessible. Hence, she claims that NARA's determination to dispose of the film collection was reached "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

The DRA requires "publication of notice in the Federal Register and an opportunity for interested persons to submit comment thereon" before the Archivist may empower an agency to dispose of federal records. 44 U.S.C. § 3303a(a). Yet, the statute does not prescribe the content or standards of the required notice, nor do cases illuminate what is required under the DRA. Nevertheless, the familiar standards governing the sufficiency of notice required under the APA [13] provide an appropriate analogy here as both notice provisions are designed to encourage public participation in agency decision-making.[14]

---

13. *See* 5 U.S.C. § 553 (prescribing content required of notice of proposed rulemaking).

14. *Compare Spartan Radiocasting Co. v. F.C.C.,* 619 F.2d 314, 321 (4th Cir.1980)(APA notice requirement "encourages participation in the

proceeding and helps ensure informed agency decision-making"); *with* H.Rep. No. 98–1124, 98th Cong., 2d Sess. 30 (1984), *reprinted in,* 1984 U.S. Code Cong. & Admin News 3894, 3905 (notice provision in the Disposal of Records Act de-

■ Under the APA, courts recognize that "[u]nfairness results unless persons are sufficiently alerted" as to the agency action being proposed. *Spartan Radiocasting Co.,* 619 F.2d at 321. Accordingly, notices published in the Federal Register must be "sufficient to fairly apprise interested parties of the issue involved" in the agency's proposal so that they know whether their interests are "at stake." *Id.* Yet, agencies are not held to a standard of perfection when providing notice. *See American Iron and Steel Inst. v. E.P.A.,* 568 F.2d 284, 295 (3rd Cir.1977)(challenged notice, while "hardly a model of clarity," was sufficient under the APA). The test is one of fairness and reasonableness in the circumstances: the notice must, under the DRA, reasonably describe the records at issue and the intended disposition such that interested parties are fairly apprised that their interests may be affected.

■ Measured against these principles, NARA's notice was adequate to satisfy the requirements of the DRA. It adequately described the specific film collection at issue, and the proposed disposition of those films. Given the scope of the subject matter covered by these films, it is reasonable to assume that anyone with a particular interest in the U.S. administration of the Ryukyu islands would have been sufficiently alerted by the notice that their interests were potentially "at stake." *Spartan Radiocasting Co.,* 619 F.2d at 321.

Plaintiff attacks NARA's use of the word "[d]uplicated" as intimating that other copies of the films would be retained. Yet, neither the use of "duplicated" alone, nor a review of the notice provision as a whole, compels plaintiff's misinterpretation of the notice provided. Rather, the notice states with reasonable clarity that the films at issue are to be disposed of, thereby depriving the government and private individuals alike of future access to this particular collection. Thus, the notice was sufficient to apprise interested parties of the proposed action, and any ambiguity in the notice could have been easily

resolved with minimal effort by parties such as plaintiff. Accordingly, plaintiff's challenge to NARA's procedural compliance with the DRA fails.

## VI.

Finally, plaintiff challenges as arbitrary and capricious under the APA [15] NARA's substantive determination that the films lack "administrative, legal, research, or other value to warrant their continued preservation." 44 U.S.C. § 3303a.

■ Review of an agency's substantive determination under the arbitrary and capricious standard is deferential, as it is designed "to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1006 (4th Cir.1985). Thus, courts are not entitled to substitute their judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Nevertheless, a reviewing court must carefully scrutinize the agency record to ascertain whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted). In reviewing the agency's explanation, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Normally, agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

signed to "enable...Archives user groups and the general public, which may be affected by the proposed disposal, to comment to the Archivist on potential impacts of such disposal," and

thereby "enhance the quality of decision-making on records disposal").

**15.** 5 U.S.C. § 706(2)(A).

product of agency expertise." *Id; See also United States v. F/V Alice Amanda,* 987 F.2d 1078, 1085 (4th Cir.1993).

These principles, applied here, compel the conclusion that NARA's disposal decision does not pass APA muster. This is so because the decision appears from the record to be based on an erroneous factual premise. Thus, NARA's articulated reason for disposing of the RG–260 films was that the films were duplicative given that other NARA film holdings adequately documented the period covered by the RG–260 films. Yet, the record reflects that the agency decisionmakers were mistaken as to the duration of this period [16] and hence could not have made a reliable or accurate comparison of RG–260 with other NARA film holdings. In particular, the record reflects that agency decisionmakers, especially Roe, apparently compared RG–260 with NARA film holdings covering only the period 1944–61, rather than 1945–72, the actual period covered by the RG–260 collection. Such a comparison is obviously invalid [17] and because the disposal decision rested on this invalid comparison, it follows that the decision was arbitrary and capricious.

But the analysis cannot end here for NARA, in response, contends that the numerous references to the mistaken 1944–61 time period are nothing more than a scrivener's error mechanically replicated throughout the administrative record, and do not reflect a genuine misunderstanding on the part of NARA's reviewers and decisionmakers. In support, NARA relies on material outside the administrative record, chiefly affidavits and depositions taken in this case. Before NARA's claim in this regard can be evaluated, a threshold question must be addressed concerning whether the agency record may be supplemented with these materials.

The starting point for this inquiry is the well-settled rule that "the focal point for judicial review should be the administrative records already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *See also Virginia Agric. Growers Ass'n, Inc. v. Donovan,* 774 F.2d 89, 92 (4th Cir.1985). Nevertheless, where the record fails adequately to explain the agency's course of conduct or the basis for its decision such that judicial review is frustrated, courts may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Id.* Where supplementation is utilized, a reviewing court is "not engaged in ordinary fact-finding, but instead is filling in gaps in the record to determine what the agency actually did." *Marshall County Health Care Authority v. Shalala,* 988 F.2d 1221, 1227 (D.C.Cir.1993). Because the propriety of NARA's disposal determination hinges on the resolution of its claim regarding the film dates, supplementation of the record through the affidavits and depositions of the agency's decisionmakers is appropriate.[18]

---

16. Specifically, Hamilton's report, Roe's recommendation, Kepley's request for disposal authorization, and the Form 115 disposal schedule all incorrectly list the RG–260 collection as spanning the period 1944–1961.

17. It may be argued that the error is of no consequence because if NARA's holdings for 1944–61 essentially duplicate RG–260, which covers 1945–72, then it is an *a fortiori* conclusion that NARA's 1945–72 holdings also essentially duplicate RG–260. This argument does not pass the smile test; the premise is fallacious; it is impossible for NARA's 1944–61 holdings to duplicate, essentially or otherwise, a collection spanning 1945–72. Indeed, far from being inconsequential, the error casts serious doubt on whether the required comparison was made at all.

18. Plaintiff has also attempted to supplement the record through the affidavit of Marlene Mayo, a professor of Modern Japanese and East Asian History who has spent approximately ten hours viewing the RG–260 films. The only apparent purpose of the affidavit, which essentially provides Mayo's own appraisal of the films, is to cast doubt on the wisdom of the NARA's conclusion that the films lack sufficient value to retain. Yet, consideration of outside materials "to determine the correctness or wisdom of the agency's decision is not permitted." *Asarco, Inc. v. United States E.P.A.,* 616 F.2d 1153, 1160 (9th Cir.1980); *See also, Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 286 (D.C.Cir.1981)(supplementation of administrative record with affidavits challenging the propriety of the agency action not permissible). Accordingly, defendant's motion to strike the Mayo affidavit must be granted.

The supplemental materials plaintiff offers appropriately focus on the knowledge of Donald Roe, the audiovisual expert charged with supervising the appraisal process, and with providing a disposal recommendation for the films. Specifically offered is Roe's deposition testimony dated June 20, 1997, and two separate Roe affidavits.[19] NARA relies chiefly on Roe's second affidavit to establish that he, like the other members of the appraisal team, was fully cognizant of the actual date span of the RG–260 films.[20] In this affidavit, Roe states for the first time that "it was obvious...from the very beginning of the reappraisal project that the collection included films from the full date span of the U.S. occupation of the Ryukyu Islands, 1945–1972." Roe concludes that the identification of the films as spanning the years 1944–1961 was a "mistake mechanically replicated in the Administrative Record." Were this the only document offered to supplement the agency record, NARA's disposal decision might be sustainable. But as it happens, Roe was also deposed and his deposition testimony contradicts the affidavit statement so that the supplemental materials do not, as a whole, alter the conclusion that NARA's disposal decision was arbitrary and capricious under the APA.

At his deposition, Roe testified at length concerning his knowledge of the dates covered by the RG–260 collection. When asked whether he thought the 1944–61 notation for RG–260 was accurate, Roe stated that it was "probably close to correct." Specifically, Roe noted his suspicion that "there are more films that are dated probably after 1945, probably closer to 1950, and maybe not so many as you get closer to 1961." When asked specifically whether there were any films in RG–260 that were created after 1961, Roe responded that he was not aware of any; "I have not seen any, to my knowledge, that date beyond 1961, but then, I have not looked for those either."

NARA's attempts to harmonize Roe's affidavit statements with this deposition testimony are unpersuasive. Rather, his deposition testimony stands in stark contrast with his more recent assertion that he was aware that the RG–260 collection included films from 1945–1972. And, it is well-settled that where, as here, a party submits an affidavit that is inconsistent with a witness's deposition testimony, "the contradictory affidavit is disregarded for purposes of summary judgment." *Gould v. Kemper Nat'l Ins. Companies,* 880 F.Supp. 527, 536 (N.D.Ill. 1995); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985)(summary judgment is appropriate where deponent merely contradicts, by affidavit, an earlier admission of fact in a deposition that if true would entitle moving party to judgment). As the Fourth Circuit has recognized, the utility of summary judgment would be greatly diminished "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony." *Barwick v. Celotex Corp.,* 736 F.2d 946, 960 (4th Cir. 1984). Thus, when presented not with "a genuine issue of material fact, but with trying to determine which of several conflicting versions [of a witness's] testimony [is] correct," courts are justified in disregarding the conflicting affidavit. *Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970, 976 (4th Cir.1990). As the second affidavit of Donald Roe is without factual support in the record, and is specifically contradicted by his own deposition testimony, it is disregarded for this review.[21]

The record, then, as supplemented, points persuasively to the conclusion that NARA's disposal decision was based on an erroneous factual premise regarding the period of years covered by the RG–260 films. The agency's error is reflected in numerous documents throughout the administrative record, and is confirmed by Roe's supplemental testimony. Because of its faulty premise, NARA's comparison of RG–260 with its other film holdings, and its subsequent conclusion that the

---

**19.** Roe's first and second affidavits are dated, respectively, August 25, 1997 and September 9, 1997.

**20.** Roe's first affidavit does not specifically address, nor does it resolve, NARA's claim regard-

ing his knowledge of the correct RG–260 film dates.

**21.** Accordingly, plaintiff's motion to strike Roe's second affidavit must be granted.

RG–260 films lack sufficient "value to warrant continued preservation," are, to say the least, unreliable. Accordingly, NARA's disposal decision is arbitrary, capricious and an abuse of discretion under the APA, and it is set aside and the matter remanded for further proceedings not inconsistent with this opinion.[22]

Nothing in this opinion or in the accompanying order should be construed as intimating any view on whether the RG–260 collection should be retained by NARA, given to OPA in Japan, or disposed of in some other manner. The disposal decision remains a matter committed to NARA's sound discretion under the DRA.

An appropriate order will issue.

22. Plaintiff filed a conditional motion for reconsideration of the dismissal of her FOIA claim in the event that NARA's disposal determination were to be held invalid. This motion must be denied because the record reflects that plaintiff has been granted continuing access to the films. Nothing in the record suggests that this access will now be denied.